UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

—————

ELMER GARCIA-MEDINA,

     Petitioner,      Case No. 1:09-cv-36

v.              Honorable Robert Holmes Bell

KENNETH T. McKEE,

     Respondent.

_____/

## REPORT AND RECOMMENDATION

    This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner is serving a term of life imprisonment for first-degree felony murder, MICH. COMP. LAWS § 750.316(b), and a consecutive two-year term for possession of a firearm during the commission of a felony (felony firearm), MICH. COMP. LAWS § 750.227(b). The Kent County Circuit Court imposed these sentences on July 21, 2004, after a jury convicted Petitioner of both charges.[1] In his *pro se* petition, Petitioner raises the following grounds for relief: (1) ineffective assistance of trial counsel for failing to request instructions for imperfect self-defense, which would have allowed the jury to consider manslaughter as a lesser included offense; (2) ineffective assistance of appellate counsel for failing to consult with Petitioner; (3) ineffective assistance of appellate counsel for failing to move for a new trial; (4) ineffective assistance of trial counsel for failing to call an alibi

---

[1]The jury also found Petitioner guilty of second-degree murder, MICH. COMP. LAWS §750.317, and first-degree home invasion, MICH. COMP. LAWS § 750.110a(2). Petitioner's second-degree murder conviction was vacated by the Kent County Circuit Court at Petitioner's sentencing on June 21, 2004. Petitioner's motion to vacate his first-degree home invasion conviction was granted by the Kent County Circuit Court on July 23, 2004.

witness; (5) newly discovered evidence that a key prosecution witness had recanted his testimony; (6) ineffective assistance of trial counsel for failing obtain translation assistance for out-of-court communications with Petitioner; and (7) ineffective assistance of appellate counsel for failing to communicate with Petitioner or to provide translation assistance.

Respondent has filed an answer to the petition (docket #7) stating that the grounds should be denied because they are meritless and because claims five, six and seven are procedurally defaulted. Upon review and applying the AEDPA standards, I find that grounds one through five and seven are without merit and that ground six is procedurally defaulted. I recommend that the petition be denied.

## **Procedural History**

### A. **Trial Court Proceedings**

Petitioner and his co-defendant, Cesar Valladolid, were charged with first-degree murder (felony murder and premeditated murder), home invasion and felony firearm in connection with the December 15, 2003, shooting death of Stanley Robinson in Grand Rapids. Petitioner and Valladolid were tried at the same time before two juries[2] beginning May 11, 2004, and concluding on May 21, 2004.[3]

---

[2]The majority of testimony was heard by both juries. Members of Petitioner's jury were excused when Valladolid introduced testimony that might be prejudicial to Petitioner's case and members of Valladolid's jury were excused when Petitioner introduced testimony that might be prejudicial to him.

[3]The trial transcripts are cited as follows:
"Tr. I" - Trial Transcript Volume I, May 11, 2004 (docket #16)
"Tr. II" - Trial Transcript Volume II, May 13, 2004 (docket #17)
"Tr. III" - Trial Transcript Volume III, May 14, 2004 (docket #18)
"Tr. IV" - Trial Transcript Volume IV, May 17, 2004 (docket #19)
"Tr. V" - Trial Transcript Volume V, May 18, 2004 (docket #20)
"Tr. VI" - Trial Transcript Volume VI, May 19, 2004 (docket #21)
"Tr. VII" - Trial Transcript Volume VII, May 20, 2004 (docket #22)
"Tr. VIII" - Trial Transcript Volume VIII, May 21, 2004 (docket #23).

Before opening statements, the Court engaged in the following colloquy with

Petitioner:

> [B]efore we go any further, . . . I want to address some questions to Mr. Garcia-Medina.  Mr. Garcia-Medina, it's my understanding that you think that you can understand or you believe you're able to understand most of what we're talking about in English.  Is that a correct statement?
>
> * * *
>
> DEFENDANT GARCIA-MEDINA: Yes.
>
> THE COURT: All right.  And that you want [the interpreter] to be with you to help you in the event that you don't understand what we're doing.
>
> THE INTERPRETER: Yes, on both parts.
>
> THE COURT:  Okay.  But that you don't need her to interpret for you about everything that is going on; is that correct?
>
> THE INTERPRETER: Well, there's a possibility I may need most of it translated.
>
> THE COURT: Okay.
>
> Well, Ms. Torres [the interpreter], here's the challenge you're giving that's making for me.
>
> You are going to have an interpreter as much as you need it and as much as you want it, because you have to be able to understand what we're doing here.  If that means the interpreter works with you every single word that's said, so be it.  But if you don't want that, if you don't want her to translate unless you ask her to, that's okay with me as well.  I want you to be able to have, you know, the trial proceed in a way that you understand it, that you're not distracted by somebody else.  But I need input from you.  I can't get inside your head Mr. Garcia-Medina.  You know, you tell me what works for you.  Because she's going to be there the whole trial.  I mean, whether you need her for every word or whether you need her for one out of every 300 words, she is going to be sitting next to you that whole time.
>
> The question that I need, because I need to tell her, when should she be translating for you?

- 3 -

THE INTERPRETER: Okay. If she's going to be with me, there is no problem. I'll ask her questions when I need it.

THE COURT: Okay. Here's what I need, Ms. Torres and Mr. Garcia-Medina and Ms. Bryant [Mr. Garcia-Medina's counsel], you need to let me know if I need to slow down the proceeding or the taking of testimony, okay? The juries already know we have a translator, they know that there's going to be some issues with that timing-wise. But I don't want him missing anything, so I need you all to actively engage me. Because, I can tell you, in this courtroom my attention, I can't imagine it's going to be directed out there, it's probably going to be to the left of Pat, our court reporter, where the witness stand is. So I might not catch it if you have an issue, okay.

MS. BRYANT [Petitioner's counsel]: I have no problem saying, "one moment, please."

(Tr. II at 5-7.)

When testimony commenced, the People called as witnesses the three people who were present at 716 Watson Street in Grand Rapids on December 15, 2003,[4] the day of Stanley Robinson's death: Rolana Alexander, Robinson's cousin; Nayrobis Garcia, a friend of Robinson's; and Peter Burton, a friend of both Alexander and Robinson.

The testimony of all three witnesses was consistent. Rolana Alexander testified that Stanley Robinson had been living with her at the Watson Street house "off and on" at the time of the shooting. (Tr. III at 32, 33.) At approximately 10:00 p.m. on December 14, 2003, Robinson and Nayrobis Garcia picked Alexander up from work. (*Id.* at 33.) Around that time Garcia told Alexander that a plan had been hatched whereby Alexander and Garcia were going to steal drugs from a girl (later identified as Collette Van Etten, whom Alexander had seen but whose name she did not know. (*Id.* at 36.) Garcia knew Van Etten and believed robbing her would be easy. (*Id.* at

---

[4]The events leading up to the shooting took place in the late evening hours on December 14, 2003, through the early morning hours of December 15, 2003, the date of Robinson's death.

37.)  At approximately 10:30 p.m. Alexander, Robinson and Garcia arrived at the Watson Street house.  (*Id.* at 34.)  Peter Burton was already at the house.  (*Id.*)  The group began drinking, smoking marijuana and doing cocaine.  (*Id.* at 35.)  At approximately 2:00 a.m. on December 15, 2003, Garcia called Van Etten and told her  she wanted to buy an "eight-ball of coke."  (*Id.* at 37.)  Garcia, Alexander and Robinson left the Watson Street house at around 2:15 a.m. and drove to the parking lot of the Sunrise Restaurant on Madison and 28th Street in Grand Rapids.  (*Id.* at 37-38.)  When they pulled into the parking lot, Van Etten was already there sitting in her car waiting.  (*Id*. at 38.)  Garcia and Alexander got out of their car and walked over to Van Etten's car and got in.  (*Id.*)  Robinson stayed in the car hiding so Van Etten would not see him.  (*Id.* at 65.)  Alexander got in the back seat and Garcia got in the front seat of Van Etten's car.  (*Id.* at 38.)   Van Etten handed Alexander the bag of cocaine then Alexander put her hand in Van Etten's back, as if she were holding a gun.  (*Id.*)  Alexander told Van Etten to "give [her] everything that she ha[d]."  (*Id.*)  Van Etten handed Alexander her money, and Alexander and Garcia got out of the car.  (*Id.* at 39.)  Alexander and Garcia got back in the car where Robinson was waiting and the three of them drove back to the Watson Street house.  (*Id.*)  Alexander parked the car next door to the Watson Street house, because she did not want anybody to see the car in front of her house in case there was trouble as a result of the robbery.  (*Id.*)  After Alexander, Robinson and Garcia went into the house, where Burton was waiting, Alexander distributed the money she had taken from Van Etten.  (*Id*. at 40.)  Robinson, Garcia and Burton each got $20 and Alexander kept $20 for herself.  (*Id.*)

Van Etten began calling Robinson within minutes after the robbery occurred.  (*Id.* at 40.)  After about two or three phone calls between Robinson and Van Etten, Alexander heard voices and the sound of running up to her door, then she heard someone kick her front door as if the person

were trying to kick the door open.  (*Id.* at 41, 44.)  Alexander took off running and hid in her bedroom closet.  (*Id.* at 45.)  Burton and Garcia also came and hid in the bedroom closet.  (*Id.* at 45-46.)  Robinson did not hide in the closet, and the last Alexander saw of him he was standing in the dining room.  (*Id*. at 47-48.)  She did not see Robinson holding a weapon.  (*Id.* at 48.)  When she got to the closet, Alexander heard gun shots.  (*Id.*  at 49.)  In total she heard the sound of about three or four gun shots.  (*Id.*)  She could not tell if the gun shots came from a single gun or more than one gun.  (*Id.*)  From her hiding place in the closet, Alexander heard two voices speaking in English and Spanish.  (*Id.* at 48-49, 50.)  She heard someone ask Robinson where his sister was and where the money was, and then she heard Robinson scream.  (*Id.* at 48.)

Alexander remained hiding in the closet until she heard tires leaving the alley at the side of her house.  (*Id.* at 50-51.)  When she got out of the closet, she saw Robinson lying at the foot of her bed.  (*Id.* at 52.)  He was breathing "real hard" and was non-responsive.  (*Id*.)  She saw that he had a gunshot wound to the leg and was bleeding from his mouth.  (*Id.*)  She ran into the living room to use her home phone to call "911," then grabbed her cell phone and ran back to the closet.  (*Id.*)  Burton and Garcia left before the police came.  (*Id.* at 53.)  Alexander knew Robinson had a gun and she could recognize it when she saw the gun in a photographic exhibit, but she did not remember seeing Robinson with the gun in the early morning hours of December 15, 2003.  (*Id.* at 54-55.)

On cross-examination, Alexander testified that Robinson could have had the gun with him but she did not see it.  (*Id.* at 101-102)  She testified that she did not know if the gun was loaded, but "if you have a gun, you will keep it loaded."  (*Id.* at 103-104.)  She also testified that when she,

Burton and Garcia took off running toward the bedroom, Robinson did not run but remained standing in the living room. (*Id.* at 102-103.)

Alexander admitted that she lied to the police when she was first questioned because she was afraid she "was going to get in trouble." (*Id.* at 56.) She also admitted that she was testifying at trial as part of a plea deal in which she would plead guilty to assault with intent to rob while armed and in exchange the prosecutor would recommend that she serve no more than one year in the Kent County Jail. (*Id.* at 56-67.)

Peter Burton's testimony was substantially similar to Alexander's. He testified that Alexander, Robinson and Garcia left 716 Watson Street sometime after the bars closed, and that they were gone for 15 to 20 minutes. (*Id.* at 121, 123.) They returned to the house with some cocaine. (*Id.* at 123.) After they returned, the house phone rang and Robinson answered it. (*Id.* at 124.) Burton heard Robinson say "Don't send nobody over to my people house." (*Id.*) After the call on the house phone, Robinson received a call on his cell phone, then another call on the house phone. (*Id.* at 127.) Around this time, Burton heard three or four car doors slam and then he heard the sound of the screen door at the front of the house being opened. (*Id.*) Once the screen door was open, Burton heard a loud kick on the front door. (*Id.* at 128.) The door did not open after the first kick. (*Id.* at 129.) Burton heard a second kick and ran toward the back bedroom. (*Id.*) The last he saw, Robinson was standing in the living room. (*Id.* at 130.) He got into the bedroom closet. (*Id.*) When he went into the closet, he was beside Alexander and Garcia was behind him. (*Id.*) As he got into the bedroom he heard gunshots. (*Id.* at 131.) He heard additional gunshots after he got in the closet. (*Id.* at 132.) He heard yelling and some voices speaking English and Spanish. (*Id.* at 131-132.) He also heard what sounded like Robinson getting beaten. (*Id.*) Burton peeked out of the closet and saw

the legs of two different people standing in front of the bed. (*Id.* at 134.) He also saw Defendant Valladolid's face, but he did not see the face of the other person. (*Id.* at 134-135, 137.)

Burton got out of the closet when he heard the sound of a car pulling away. (*Id.* at 139.) He first checked on Robinson who had blood coming down his face, hands and arms; he was "real bloody." (*Id.* at 139.) Robinson was non-responsive. (*Id.*) Burton told Alexander to call an ambulance. (*Id.*) Burton then left. (*Id.* at 140.) He was scared and he had to see his probation officer in the morning. (*Id.*) He knew he should not be in a situation where there was drinking and drugs. (*Id.*) He left with Garcia in Alexander's car and went to his house and then to see his probation officer. (*Id.*)

Burton identified Robinson's gun from a photographic exhibit. (*Id.* at 141.) He testified that he saw Robinson go get his gun out of the front bedroom after he got the phone call from the "female [telling him] she was sending somebody over there." (*Id.* at 142.) Robinson had the gun in his hands but Burton did not see him pick it up or use it as Burton ran to the closet. (*Id.* at 142.)

On cross-examination, Burton admitted that at the preliminary hearing he had identified Petitioner as the man he recognized from the shooting and not Defendant Valladolid. (*Id.* at 145-146.) He testified that he identified Petitioner because Defendant Valladolid had given him a look while he was on the stand testifying and that this look had scared him so he lied. (*Id.* at 146.) Burton also testified that at the preliminary hearing he said that he had seen Robinson pick up his gun when the people started to enter the house, but he did not know if the gun was loaded. (*Id.* at 151-152, 166.) About six months prior to the shooting incident, Burton had seen a gun at the

Watson Street house that was capable of shooting .22 caliber bullets. Robinson was not there when Burton saw this gun, but Burton knew the gun did not belong to Alexander. (*Id.* at 167-168.)

Additionally, on cross-examination, Burton testified that he did not know that Robinson was not going to run when the door was being kicked in. (*Id.* at 156.) He testified that he heard two or three shots fired as soon as the door was kicked in and 30 or 40 seconds later he heard a second set of gunshots when he was in the closet. (*Id.* at 159-160.) He peeked out of the closet before the second set of gunshots. The man he saw did not speak and Burton does not recall that he had a weapon. (*Id.* at 160.) He also testified that he knew that Robinson had a .40 caliber gun with him in the living room and that he heard shots fired almost as soon as the front door was kicked in. *Id.*

Nayrobis Garcia's testimony was consistent with Burton's and Alexander's.[5] Garcia testified that she was with Robinson at the Watson Street house on December 14-15th. (Prelim. at 191.) At Robinson's direction she set up the meeting at which she and Alexander robbed Van Etten of money and cocaine. (*Id.* at 192-194.) Garcia's testimony regarding the robbery and the shooting incident at the Watson house were substantially the same as Burton's and Alexander's testimony. However, she did not recall seeing Robinson with a gun on the night of the shooting. (*Id.* at 203.) She had seen Robinson with a small hand gun before, but not on the night of the shooting. (*Id.*)

Officer Lubbers testified that while on duty on December 15, 2013, he went to a house at 23 Eola in Grand Rapids (the Rios-Sanchez house), detained persons attempting to leave

---

[5]Because Garcia was unavailable at trial, her preliminary examination testimony was read into the record. The Court advised the jury "to consider the testimony in the same way that [they] would consider any other testimony that [they] hear in the course of the trial." (Tr. IV at 9-10.) Accordingly, citations to Garcia's testimony are from the preliminary examination transcript and not the trial transcript. Garcia's testimony was offered during the second day of the preliminary examination, January 13, 2004. The preliminary examination transcript is referred to as "Prelim."

and searched the house. (Tr. III at 175.)  He found a sawed off shotgun and a .22 caliber rifle at the Rios-Sanchez house.  (*Id.* at 176-177.)  He took Petitioner into custody, and when he conducted a pat-down search incident to arrest, he found a .40 caliber bullet in Petitioner's pants pocket.  (*Id.* at 178, 180.)

Detective Pat Needham was among the Grand Rapids Police Department officers who went to a house where Burton had told them they might find the possible suspects in the shooting. (Tr. IV at 13-14.)  The house belonged to Vicki Rios-Sanchez.  (*Id.* at 15.)  Rios-Sanchez signed a "consent to search" waiver form authorizing a search of the house without the need for a search warrant.  (*Id.* at 16.)  Needham and other GRPD officers searched her house.  (*Id.* at 17.)  Rios-Sanchez directed Needham to a bag that formerly contained diapers.  (*Id.*)  The bag was located in Rios-Sanchez's bedroom, lodged between her mattress and box spring.  (*Id.*)  The bag contained a handgun that had been taken apart and was in pieces inside the bag.  (*Id.* at 17-18.)

Grand Rapids Police Department Officer Charles Anderson testified about a second gun that was found at the Rios-Sanchez home.  He testified that the gun was found underneath a chair in the living room.  (*Id.* at 34.)  The gun had a magazine in it.  (*Id.* at 40.)

Grand Rapids Police Department Officer Dean Garrison, a crime scene technician with the forensic services unit, testified regarding the four guns that were found at the Rios-Sanchez home.  He testified that two .22 caliber guns were found; a Jennings .22 caliber pistol was found in the bag that formerly contained diapers, and a .22 caliber Marlin rifle was found in the northeast bedroom of the house.  (*Id.* at 47.)  In addition, an Excel 12-gauge sawed off shotgun was found "immediately behind" the door of the northeast bedroom.  (*Id.*)  Finally, a Ruger carbine was found under a chair in the living room.  (*Id.* at 48.)  Garrison did not find the guns, but they were pointed

out to him by the detectives on scene. He photographed them, collected them and tried to obtain prints from the guns and ammunition found at the Rios-Sanchez house. (*Id.*) Garrison did not find any usable prints on any of the items collected. (*Id.* at 49.)

Cristen Rodriguez testified that she lived at the Rios-Sanchez house with her boyfriend, Anthony Escobar. (*Id.* at 64.) She was at the Rios-Sanchez house on December 15th when Collette Van Etten left to sell some cocaine to Nayrobis Garcia. (*Id.* at 65.) Van Etten was gone about 15 minutes. (*Id.* at 66.) When she returned, Van Etten was yelling that she had been robbed. (*Id.*) Van Etten gathered everyone at the house, including Petitioner, Valladolid, Oscar Durand and Roger Escobar, and urged them to go back with her and confront the robbers. (*Id.* at 66, 77.) Rodriguez did not go. (*Id.* at 67.) Rodriguez did not see anyone with a gun when they left the house. (*Id.* at 68.) When the group returned, Rodriguez saw Petitioner and Valladolid with guns. (*Id.*) Petitioner came back with a black, long gun. (*Id.* at 69.) Valladolid came back with a small .22 caliber gun. (*Id.* at 69.) The group also came back with a plate of cocaine. (*Id.* at 70.) When the group returned, the men were cleaning or wiping down the guns. (*Id.* at 71-72.) She did not see any injuries on Petitioner or Valladolid. *Id.*

The prosecution had hoped to call Pamela Jacobo, another of the individuals at the Rios-Sanchez house on the day of the shooting, but Jacobo refused to testify. (*Id.* at 89-90.) After an exchange with the Court, at which time Jacobo was held in contempt and removed from the courtroom, the Court commented on an interaction between Jacobo and Petitioner. (*Id.* at 90-91.) The Court noted that Petitioner had smiled approvingly at Jacobo when she made it clear that she would not testify. (*Id.* at 91.) The Court admonished those present that influencing witnesses was

a separate offense and if the Court learned of any efforts to influence witnesses, there would be a price to pay.  (*Id.* at 90-91.)

The prosecution next called Colette Van Etten.  Van Etten testified consistently with Alexander and Burton regarding the circumstances of the robbery.  (*Id.* at 100-103.)  She testified that when she got back to the Rios-Sanchez house, she told her mother that she was robbed and that she was going to go to the house of the woman who robbed her.  (*Id.* at 104.)  She knew that the woman who robbed her was Robinson's sister, although she did not know her name.  (*Id.*)  She knew the house was on Watson Street but did not know the street address.  (*Id.*)  Three vehicles went with her to the house on Watson Street.  (*Id.* at 105.)  She drove a red Oldsmobile with her sister Tiffany VanEtten, Pamela Jacobo and Juan riding as passengers.  (*Id.*)  Her mom (Vicki Rios-Sanchez) drove a blue Neon with Petitioner and Valladolid as passengers.  (*Id.* at 105-106.)  The third vehicle was a blue van carrying Oscar Durand and Roger Escobar.  (*Id.*)

Van Etten testified that she knew there was a .22 automatic handgun in the blue Neon and that the gun belonged to Valladolid.  (*Id.* at 107.)  She did not know if Valladolid actually had the gun in his possession or if any other weapons were taken.  (*Id.*)  The three cars drove to Watson Street.  (*Id.*)  During the drive, Van Etten was calling Robinson to tell him that his sister had robbed her.  (*Id.* at 108.)  She called Robinson three or four times.  (*Id.*)  Before the Oldsmobile and Neon made it to the Watson Street house, they gathered in a parking lot down the street because Van Etten was having second thoughts about going over to the house.  (*Id.* at 108.)  Ultimately they continued on to the Watson Street house.  (*Id.* at 109.)  The Oldsmobile and Neon stopped in front of the house and the van pulled into the alley. (*Id.* at 110.)  Van Etten saw Petitioner and Valladolid get out of the Neon and go running toward the house.  (*Id.*)  She also saw that Roger Escobar had gotten out of the

van. (*Id.* at 111.) She was still on the phone with Robinson when Petitioner and Valladolid kicked in the door of the house. (*Id.*) She heard a loud boom and then heard Robinson say "What the fuck." The phone went dead. (*Id.* at 111-112.) She heard gunshots, left the area and drove around the block and came through the alley next to the Watson Street house. (*Id*. at 112) When she got to the alley, she saw Petitioner and Roger Escobar running away from the house and getting into the van, which then left. (*Id.*) She did not see Valladolid. (*Id.* at 114.) She drove back to the Rios-Sanchez house. (*Id.*) Fearful of reprisal, she got her young son. She, Valladolid and Pamela Jacobo took him to Pamela Jacobo's mother's house. (*Id.* at 115.) When they returned to the Rios-Sanchez house, everyone was there. Petitioner, Valladolid and the other men seemed to be arguing. (*Id.* at 119.) Valladolid said that he shot someone. (*Id.* at 120.)

On cross-examination, Van Etten testified that the .22 caliber handgun belonged to Valladolid, and that the .22 caliber rifle and sawed off shotgun belonged to the Rios-Sanchez house. (*Id.* at 139-140.)

The Court excused the Garcia-Medina jury and Van Etten continued to testify regarding Valladolid's role in the shooting. (*Id.* at 150-151.)

Vicki Rios-Sanchez testified consistently with Van Etten regarding the events leading up to the shooting at the Watson Street house. (Tr. V at 12-19.) She was driving with Petitioner and Valladolid as passengers in her car. (*Id.* at 19.) Valladolid had his .22 caliber handgun when he got out of the car. (*Id.* at 23.) Petitioner did not have a weapon when he got out of the car. (*Id.*) She pulled up around the corner from the Watson Street house, and the men got out of her car. (*Id.* at 19.) The men walked around the corner so Rios-Sanchez could no longer see them. (*Id.* at 20.) Then she heard two gunshots from the direction of the Watson Street house. (*Id.*)

Rios-Sanchez saw Roger and Petitioner run out of the house and get into the van. (*Id.* at 22.) Once they were in the van, all the vehicles left the area of the Watson Street house. (*Id.* at 21-22.) When Rios-Sanchez got back to her house, she saw that Petitioner had a plate of cocaine that had been taken from the Watson Street house. (*Id.* at 24, 25.) She learned that Petitioner had taken a gun from the Watson Street house. (*Id.*) She did not see the gun until the next morning when the police arrived. (*Id.* at 25.) Petitioner had been sleeping in a chair with the gun shoved down his pants. (*Id.*)

After the shooting, when everyone returned to the house, Valladolid sat in Rios-Sanchez's bedroom and took apart his .22 caliber handgun. (*Id.* at 26.) Rios-Sanchez put the gun in a bag and stuck it under her mattress. (*Id.* at 26.) The sawed-off shotgun belonged to Tony Escobar and was kept at the Rios-Sanchez house. (*Id.* at 27.) Rios-Sanchez testified that she was told that Roger Escobar had the sawed-off shot gun the night of the shooting, but she never saw him with it. (*Id.* at 27-28.) When everyone was together at her house, Rios-Sanchez heard Petitioner and Valladolid say that they killed the man. (*Id.* at 28.) Rios-Sanchez thinks it was Valladolid who said he shot the guy (Robinson) three times in the head. (*Id.*) She was not aware of Petitioner or Valladolid being injured. (*Id.* at 29.)

After Valladolid had left the Rios-Sanchez house with Van Etten to transport her son to a different location, Petitioner and Rios-Sanchez had a conversation. (*Id.* at 60.) Petitioner told Rios-Sanchez that "they had killed a guy." (*Id.* at 60.) Petitioner explained that "he put the gun to his head and shot him." (*Id.* at 61.)

On cross-examination, Rios-Sanchez testified that when everyone returned to her house, Petitioner was explaining how he had kicked in the Watson Street door and that the guy inside

the house had a gun. (*Id.* at 54.) She does not recall who said it but at some point, someone told her that Petitioner "had taken the gun away from the guy and shot him." (*Id.* at 64.)

Natalie Delarosa, Petitioner's friend, testified regarding letters she had received from Petitioner. (*Id.* at 67.) Delarosa was not present for any of the events that took place between December 14 and 15, 2004, and did not know any of the individuals who were involved in those events. (*Id.* at 67-68.) Delarosa read to the jury a letter she had received from Petitioner on March 8, 2004. (*Id.* at 68.) Several sentences in the letter were written in Spanish. (*Id.* at 69-70.) To the extent that the letter contained Spanish sentences, the interpreter read them in Spanish and then translated to English. (*Id.*) Delarosa read the rest of the letter in English. (*Id.* at 71-74.) In the letter, Petitioner wrote that Valladolid kicked down the door of the Watson Street house and immediately started shooting at Robinson. (*Id.* at 72.) Petitioner initially stayed outside, but then he heard another shot and went inside the house to see if Valladolid was okay. (*Id.*) When Petitioner got in the house Robinson shot at him but missed. (*Id.*) Petitioner tried to take Robinson's gun away but Robinson would not let go, so Valladolid shot Robinson two more times. (*Id.*) Petitioner then took Robinson's gun away and shot Robinson two times. (*Id.*)

The interpreter read a Spanish sentence in which Petitioner wrote that he shot Robinson two times, one time in the hand and one time in the head. (*Id.*) Delarosa continued reading what Petitioner had written in English. Petitioner wrote that Roger Escobar came in two minutes later and grabbed the plate of cocaine and something else, but when Roger spoke to the police he told the police that he saw Petitioner shoot Robinson. (*Id.* at 73.) Petitioner wrote that he did not have a gun with him, he only had a beer bottle. (*Id.*) Petitioner wrote that there were a lot of people who told on him, including Anthony Escobar, Oscar Durand, Roger Escobar, Colette

- 15 -

Van Etten, Tiffany Van Etten, Vicki Rios-Sanchez and Pamela Jacobo. (*Id.*) Petitioner wrote that he read a report that said that Tiffany told the police where the gun that Petitioner took from Robinson was located because when they searched the house they did not find it. (*Id.*) Rios-Sanchez told the police where Valladolid's gun was located. (*Id.*) Petitioner wrote that "everybody knows that I did it." (*Id.*) Petitioner wrote in Spanish that he did it [shot Robinson] but he did it in self-defense. (*Id.*) "I was only trying to defend myself because I was not going to permit that asshole to shoot me." (*Id.*) Petitioner's letter continued in English and concluded with Petitioner writing about in-fighting among the various individuals involved in the shooting. (*Id.* at 74.)

Tiffany Van Etten (Tiffany) testified consistently with the other individuals who were present at the Rios-Sanchez house on December 14th-15th regarding the events leading up to the shooting at Watson Street, the shooting itself and the return to the Rios-Sanchez house. However, she testified that she saw Petitioner bring a rifle into the house. (*Id.* 95.) She also testified that Petitioner was demonstrating to the rest of the group what happened at the Watson Street house. (*Id.* at 95.) Petitioner complained about being shot and she saw that he had a "little graze on his finger." (*Id.* at 96.)

On cross-examination, Tiffany testified that gunfire started as soon as Petitioner and Valladolid went inside the Watson Street house. (*Id.* at 103.) She saw Roger Escobar leave the house with a shotgun in his hands. (*Id.* at 105.) She was at the Rios-Sanchez house when the van pulled up and she saw Valladolid get out of the van. (*Id.* at 105-106.) She also saw Petitioner get out of the van with a large .40 caliber gun. (*Id.*) Petitioner indicated that Robinson had a firearm and that he fired it when Petitioner and Valladolid went into the Watson Street house. (*Id.*)

On redirect Tiffany testified that she saw Valladolid carrying a handgun when he ran up to the door of the Watson Street house. (*Id.* at 116.) On recross, she testified that she never saw Petitioner with a weapon while at the Watson Street house. (*Id.* at 117.)

After the Valladolid jury was excused, Tiffany continued to testify before Petitioner's jury. She testified that when Petitioner was at the Rios-Sanchez house, he talked about what happened at the Watson Street house. (*Id.* at 118.) "He put his hand up to his head, and he said he went like this to the guy, and the guy fell (indicating)." (*Id.*) Although not described at trial, the clear import of this testimony is that Petitioner demonstrated that he shot Robinson in the head and after he did, Robinson fell to the ground.

Oscar Durand testified consistently with the other individuals who were present at the Rios-Sanchez house on December 14th-15th regarding the events leading up to the shooting at Watson Street, the shooting itself and the return to the Rios-Sanchez house. Durand testified that he drove his van over to the Watson Street house. (*Id.* at 128.) Roger Escobar was his passenger. (*Id.*) He saw Valladolid and Petitioner go into the house and then heard some shots. (*Id.* at 131.) After Valladolid and Petitioner went into the Watson Street house, Roger Escobar got out of Durand's van and went into the house. (*Id.* at 131.) When Roger Escobar, Valladolid and Petitioner left the Watson Street house Roger Escobar had a 12 gauge shotgun with him, Valladolid had a .22 caliber handgun and Petitioner had the gun of the other person (Robinson). (*Id.* at 132-133.) The three men got into Durand's van and Durand heard Valladolid say that they had shot the guy. (*Id.* at 134.) Durand testified that Petitioner had a gun when he got back to Rios-Sanchez house. (*Id.* at 136.)

On cross-examination, Durand testified that he heard gunfire immediately after Petitioner and Valladolid went into the Watson Street house. (*Id.* at 139.) Back at the Rios-Sanchez house, Durand heard talk about the guy in the house shooting at Petitioner and Valladolid. (*Id.* at 140.) He did not hear about any of his friends being injured inside the Watson Street house. (I*d.* at 145.)

Grand Rapids Police Department Detective Matt DeJong testified regarding evidence taken to the Michigan State Police lab and Petitioner's injury. (*Id.* 152-156.) DeJong testified that Petitioner showed him a very small wound on his right pinky finger. (*Id.* at 157.) Dejong had the wound photographed. (*Id.*) That was the only injury Petitioner complained of, and DeJong did not observe any injuries to Valladolid. (*Id.* at 158.) Neither man was taken for treatment of any injuries. (*Id.*)

Roger Escobar testified consistently with the other individuals who were present at the Rios-Sanchez house on December 14th-15th regarding the events leading up to the shooting at Watson Street, the shooting itself and the return to the Rios-Sanchez house. He was in the van with Oscar Durand. (*Id.* at 174.) When the van got to the Watson Street house, he saw Petitioner and Valladolid exit the blue car and go to the front door of the Watson Street house. (*Id.* at 177.) Petitioner and Valladolid went in the house, and within a couple of seconds he heard shooting, maybe three or four shots. (*Id.*) He got out of the van and went up to a window at the side of the house. (*Id.* at 178-179.) He could hear voices speaking in Spanish asking where the money was and where the drugs were. (*Id.* at 180.) He went in the front door of the house and then walked to the last room at the back of the house where he saw Robinson lying on the floor shot. (*Id.* at 181.) He did not know where Robinson had been shot, but he could see blood on the floor. (*Id.* at 182.)

Robinson was lying on his side with his arm up trying to cover his head. (*Id.* at 184.) Petitioner was inside the room holding Robinson's gun and pointing it at Robinson. (*Id.* at 183.) Petitioner was standing very close to Robinson within about two feet of where Robinson was lying down. (*Id.* at 184.) Valladolid was also inside the room. (*Id.* at 185.) Petitioner and Valladolid were asking Robinson where the drugs were. (*Id.* at 184.) Then Petitioner shot Robinson. (*Id.* at 186.) Escobar got scared and got out of the room. (*Id.* at 187.) He went toward the kitchen and past a table with a plate of cocaine on it. (*Id.* at 188.) He told Petitioner and Valladolid about the plate. (*Id.*) Petitioner grabbed the plate. (*Id.*) Escobar asked them if they got the money. (*Id.* at 189.) Petitioner handed the plate to Valladolid and walked back toward the room in which Robinson was laying on the floor. (*Id.* at 189-190.) Escobar and Valladolid began to walk toward the front door. (*Id.* at 190.) As Escobar was walking toward the front door, he heard a shot coming from the room in which Robinson lay bleeding. (*Id.*) Escobar and Valladolid left the house and got into the van. (*Id.* at 191.) Right after they closed the van door, Escobar heard Petitioner knock, Escobar opened the van door, and Petitioner jumped inside. (*Id.*) The van then left the scene and drove back to the Rios-Sanchez house. (*Id.*) Petitioner and Valladolid had weapons in the van. (*Id.* at 192.) Valladolid had a small handgun. (*Id.*) Escobar had a shotgun with him when he left the Rios-Sanchez house. (*Id.* at 193.) Escobar had it at the Watson Street house, and when he got back into the van he still had it. (*Id.*) While in the van driving back to the Rios-Sanchez house, Valladolid and Petitioner were talking about what happened in the Watson Street house. (*Id.* at 194.) They talked about shooting Robinson and seemed happy about what they had just done. (*Id.* at 194-195.) Before they got out of the van, Valladolid and Petitioner told Oscar Durand and Escobar not to tell anybody what happened and just to keep what happened at the Watson Street house between them.

(*Id.* at 196.)  Nevertheless, when they got inside the Rios-Sanchez house, Valladolid and Petitioner started telling everyone what had happened and what they did.  (*Id.*)  They were not trying to hide what happened at the Watson Street house.  (*Id.* at 196.)

On cross-examination Escobar testified that, when he got into the bedroom, Petitioner had Robinson's rifle.  (*Id.* at 203.)  He did not see Petitioner take the rifle from Robinson.  (*Id.* at 203-204.)  He saw Petitioner shoot Robinson in the arm.  (*Id.* at 204.)  After he left the bedroom he heard one or two more shots.  (*Id.*)  Valladolid was not in the bedroom when Esocobar left the bedroom.  (*Id.*)  Escobar and Valladolid started walking out of the house, but Petitioner walked back into the bedroom.  (*Id.* at 207.)  Escobar heard another shot being fired as he left the house.  (*Id.* at 208.)  Escobar heard people talking about Petitioner having a "wad of money."  (*Id.* at 210.)  After Escobar and Valladolid were in the van and the van door was shut, Petitioner knocked on the van door and was let into the van.  (*Id.* at 210.)

After the van returned to the Rios-Sanchez house, Escobar heard Valladolid say that he had shot "the guy" (Robinson) in the legs. (*Id.* at 211.)  Both Valladolid and Petitioner said that they shot "the guy" (Robinson) in the head.  (*Id.*)  Petitioner told Escobar that he had shot Robinson with the gun that he had taken from Robinson.  (*Id.*)  Escobar had heard people saying that Robinson had shot at the men when they entered the Watson Street house. (*Id.* at 221.)

Daryl Clemens, a crime scene technician for the Grand Rapids Police Department testified that he attended the Robinson autopsy and took photographs.  (*Id.* at 232.)  Among the photographs he took were photographs of "two small caliber projectiles and two small metal fragments" that were recovered from Robinson's body.  (*Id.* at 236.)

Ann Hunt, who works in the biology/DNA subunit of the Michigan State Police Department of Forensic Science, was qualified as an expert with respect to DNA analysis. (*Id.* at 246.) Her job was to conduct blood and DNA analysis on items collected by the Grand Rapids Police Department. (Tr. VI at 23-25.) She testified that she found blood on Roger Escobar's white tennis shoe and his navy blue pants. (*Id.* at 28-29.) The blood on both the tennis shoe and the pants matched the DNA profile of Robinson. (*Id.*) She did not find any blood stains on any of Petitioner's items. (*Id.* at 29.)

Dr. Cohle, a forensic pathologist, conducted Robinson's autopsy. (*Id.* at 40, 45.) When examining Robinson's body, Dr. Cohle found that he had seven gunshot wounds and two superficial cuts on the palm of his right hand. (*Id.* at 48.) There was a gunshot entry wound at Robinson's left temple and an exit wound at his right temple. (*Id.* at 49-50.) Robinson also had a graze wound on his forehead above his right eyebrow. (*Id.* at 50-51.)

Dr. Cohle testified that there was another entry wound in the front wrist area of Robinson's right arm and an exit wound at the back of his arm. (*Id.* at 54.) Robinson also had an entry wound in his right shoulder. (*Id.* at 54-55.) Dr. Cohle surmised that, because of the irregular shape of the entry wound, it was likely that the bullet passed through something before it hit Robinson's shoulder. (*Id.* at 55.) He suggested that Robinson raised his arm in such a way that the bullet passed through his wrist or forearm and then reentered at his shoulder. (*Id.*) Dr. Cohle noted that there were two exit wounds on the back of the arm and that this was likely caused by a bullet separating from its jacket, with both the bullet and jacket exiting the arm at different locations. (*Id.* at 56.) He noted the bullet that hit Robinson in his arm and shoulder was not a .22 caliber bullet,

because they do not have a jacket. (*Id.*) Thus, it had to be a bullet with a higher caliber than a .22. (*Id.*)

Dr. Cohle testified that Robinson also had an entry wound in the lower portion of his left leg below the knee. (*Id.* at 57.) Robinson also had two additional bullet wounds in his legs; one on the left thigh and one on the inside of the right thigh. (*Id.* at 58.) He testified that the bullet wounds in Robinson's lower body were smaller than those in his upper body. (*Id.* at 57.) He recovered two intact .22 caliber bullets and fragments of another bullet that were consistent with a .22 caliber bullet. (*Id.* at 58.) Dr. Cohle testified that he recovered one of the .22 caliber bullets from Robinson's right thigh. (*Id.*) He surmised that the bullet had traveled from back to front, upward and left to right. (*Id.* at 59.) Because the bullet was traveling upward, Dr. Cohle suggested that Robinson was most likely lying down when this wound occurred and the shooter would be standing at his feet and shooting toward him. (*Id.*) The two bullet wounds in Robinson's left thigh and calf area were likely inflicted in the same manner. (*Id.* at 60.) Dr. Cohle testified that the bullets did not hit any major blood vessels or nerves in Robinson's legs and that, though painful, it ultimately would not have rendered Robinson unable to walk. (*Id.* at 61.)

Dr. Cohle testified that Robinson's head wound was fatal and that he would not have lived very long after the wound was inflicted. (*Id.* at 62.) He testified that after a head shot like the one incurred by Robinson, the victim would not have the ability to think or move purposefully. (*Id.* at 83.) The other wounds were not, by themselves, fatal. (*Id.*) He testified that the cause of Robinson's death was the gunshot wound to the head and the manner of death was homicide. (*Id.*)

Dr. Cohle testified on cross-examination that there were scenarios other than the one he testified to that had Robinson lying down when he was shot. (*Id.* at 65-66.) He also testified that Robinson's head wound was consistent with bullets being fired from a .40 caliber firearm. (*Id.* at 68.) The wounds to Robinson's lower body were consistent with bullets being fired from a .22 caliber handgun. (*Id.* at 68-69.)

Dr. Cohle testified that no soot residue was found. (*Id.* at 74.) He explained that "soot travels about six inches from the muzzle of a weapon when the weapon is fired." (*Id.*) The absence of soot can mean that the distance from the muzzle to the victim is greater than six inches or that something came between the weapon and the victim, such as clothing or a door. (*Id.*) He confirmed that there was no evidence to suggest that a gun was put to the victim's head and then fired. (*Id.* at 75.)

Jeff Crump, a firearms examiner with the Michigan State Police Laboratory, testified as an expert witness in the area of firearms analysis. Crump testified regarding the four weapons recovered as evidence: (1) a .22 caliber semiautomatic pistol; (2) a 12-gauge, single shot shotgun; (3) a .40 caliber semiautomatic rifle; and (4) a .22 semiautomatic rifle. (*Id.* at 99-101.) All of the guns were operational. (*Id.*) Crump testified that he analyzed two .40 caliber fired metal jacketed bullets. (*Id.* at 101-103.) These bullets were identified as being consistent with bullets that could have come from the .40 caliber semiautomatic rifle. (*Id.* at 105.) These bullets were identified as having been recovered from the dining room ceiling and the floor of the Watson Street house. (*Id.*) Crump also analyzed two fired lead bullets and four metallic fragments that were recovered during the Robinson autopsy. (*Id.* at 106.) Crump determined that the bullets were most consistent with having been fired from the .22 caliber semiautomatic pistol. (*Id.* at 107.) Crump analyzed two .40

caliber fired cartridge cases identified as having come from the .40 caliber semiautomatic rifle. (*Id.* at 110.) These items were recovered from the Watson Street house. (*Id.* at 109.) Crump also analyzed two additional bullets or cartridges identified as having been fired from the .22 caliber semiautomatic rifle. (*Id.* at 112.) These items were found at the Rios-Sanchez house. (*Id.*)

On redirect, Crump testified that the .22 caliber pistol had a problem with the feeder, which caused the last bullet in the magazine to jam. (*Id.* at 127-128.) Thus, although the maximum capacity for the .22 caliber pistol was seven bullets in the magazine plus one in the chamber, if working consistently with Crump's testing, the .22 caliber pistol would fire seven bullets without a problem but the eighth bullet might not be fired. (*Id.* at 128.)

After Crump's testimony, the people rested their case. (*Id.* at 129.) Petitioner's jury was excused. (*Id.* at 131.) Valladolid took the stand and testified in his own defense. Petitioner did not present a defense.

At the conclusion of trial, on May 21, 2004, the jury found Petitioner guilty of felony murder, the lesser-included offense of second degree murder, home invasion and felony firearms. (Tr. VIII at 26.) On June 21, 2004, Petitioner was sentenced to life in prison without the possibility of parole on the felony murder charge, 20 to 40 years on the first-degree home invasion charge and two years on the felony firearm charge. (Sentencing Tr. at 15, docket #24.) As required by state law, the Court vacated the second-degree murder conviction. (*Id.*)

## B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on April 28, 2005, raised one issue: ineffective assistance of trial counsel for failing to request a manslaughter instruction based on a theory of imperfect self-defense. (*See* Def.-

Appellant's Br. on Appeal, docket #25.) On October 21, 2005, Petitioner filed a pro per supplemental brief raising three issues: (1) ineffective assistance of appellate counsel for failing to visit, consult or communicate with Petitioner; (2) ineffective assistance of appellate counsel in failing to move for a new trial; and (3) ineffective assistance of trial counsel in failing to call a listed alibi witness. (*See* Def. Pro Per Br. on Appeal, docket #25.) On November 17, 2005, in an unpublished per curiam opinion, the court of appeals affirmed the conviction. (*See* 11/17/05 Mich. Ct. App. Opinion (MCOA Op.), docket #25.) Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court, raising the same issues presented to the court of appeals, plus an additional new issue: newly discovered evidence that a key prosecution witness had recanted his testimony requires a new trial. (*See* Pro Per App. for Leave to Appeal, docket #26.) By order entered March 27, 2006, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* Mich. Sup. Ct. Ord., docket #26.)

### C.      Post-conviction relief

On February 15, 2007, Petitioner filed a motion for relief from judgment in the Kent County Circuit Court, raising three issues: (1) newly discovered evidence (the same issue initially raised in the Michigan Supreme Court); (2) ineffective assistance of trial counsel for failure to call an alibi witness, failure to argue intoxication as a defense, and failure to contest the search and seizure of Petitioner's residence; and (3) ineffective assistance of appellate counsel for failing to communicate with or provide translation assistance to Petitioner. (*See* Mot. for Relief from Jdgmt., docket #28.) In an opinion and order filed March 5, 2007, the Kent County Circuit Court denied

Petitioner's motion for relief from judgment. (*See* Kent Cnty. Circuit Ct. Op. & Ord., docket #28.)[6]

On October 31, 2007, Petitioner filed a *pro per* delayed application for leave to appeal. On May 13, 2008, the Michigan Court of Appeals denied Petitioner's delayed application for leave to appeal for failure to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D). (*See* Mich. Ct. App. Or., docket #28.) On June 6, 2008, Petitioner filed a pro per delayed application for leave to appeal in the Michigan Supreme Court. The Michigan Supreme Court denied Petitioner's delayed application for leave to appeal because Petitioner failed to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D). (*See* Mich. Sup. Ct. Ord., docket #1-3, Page ID# 157.)

## **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:

"(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in

---

[6]Petitioner filed an amended motion for relief from judgment with the Circuit Court. (*See* docket #1, Page ID##75-78.) In this amended motion, Petitioner raised the following three claims: (1) newly discovered evidence; (2) ineffective assistance of trial counsel for failure to obtain translation assistance for out-of-court communications with Petitioner; and (3) ineffective assistance of appellate counsel for failing to communicate with Petitioner. *(See id.* at Page ID##76-77.) The Circuit Court did not consider Petitioner's amended motion for relief from judgment. (*See id.* at Page ID#205.)

a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).   In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final."  *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court; (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply.  *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision

applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410.

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington v. Richter*, 131 S. Ct. 770, 784 (2011); *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096. Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Richter*, 131 S. Ct. at 785 (noting that the presumption that the state court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial

court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

**Discussion**

### I. <u>Ineffective Assistance of Counsel</u>

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. The two-prong *Strickland* test applies to claims of ineffectiveness brought against both trial and appellate counsel. *See Strickland*, 466 U.S. at 687-696 (examining conduct of trial counsel); *Smith v. Murray*, 477 U.S. 527, 535-536 (1986) (applying *Strickland* to claim of attorney error on appeal). A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Because the state courts decided petitioner's claims of ineffective assistance of counsel on their merits, their decision must be afforded deference under AEDPA. *See Burt v. Titlow*, 134 S. Ct. 10, 15-16 (2013); *Harrington v. Richter*, 131 S. Ct. at 784. To receive habeas relief, petitioner must demonstrate that the state court's decision was contrary to, or represented an unreasonable application of, *Strickland v. Washington*. *See Bell v. Cone*, 535 U.S. 685, 698-99 (2002). As the Supreme Court recently has observed, while "'[s]urmounting *Strickland*'s high bar is never an easy task,' . . . [e]stablishing that a state court's application was unreasonable under § 2254(d) is all the more difficult." *Harrington*, 131 S. Ct. at 788 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). Because the standards under both *Strickland* and § 2254(d) are highly deferential, "when the two apply in tandem, review is 'doubly' so." *Harrington*, 131 S. Ct. at 788 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). In those circumstances, "[t]he question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

## A. Trial Counsel

### 1. Failing to Request Instructions for Imperfect Self-Defense and the Lesser Included Offense of Voluntary Manslaughter (Claim One)

In his first claim for relief, Petitioner asserts that his trial counsel was ineffective for failing to request instructions for imperfect self-defense, which would have allowed the jury to consider manslaughter as a lesser included offense.

The Michigan Court of Appeals found that there was no evidence to support a claim of imperfect self-defense. Thus, counsel was not ineffective for failing to advance such a theory. In rejecting Petitioner's claim, the Michigan Court of Appeals stated:

Counsel was not ineffective for failing to advance a theory of imperfect self-defense because there was no evidence to support that claim as it relates to Garcia-Medina. Panels of this Court have applied the doctrine of imperfect self-defense when a defendant would have had the right to assert self-defense but for his actions as the initial aggressor. *People v Kemp*, 202 Mich App 318, 324; 508 NW2d 184 (1993), and *People v Butler*, 193 Mich App 63, 67; 483 NW2d 430 (1992). For a valid claim of self-defense, a defendant's actions must have appeared at the time to be immediately necessary, i.e., the defendant could only utilize the amount of force necessary to defend himself. CJI2d 7.15; *People v Heflin*, 434 Mich 482, 502, 508; 456 NW2d 10 (1990); *People v Deason*, 148 Mich App 27, 31; 384 NW2d 72 (1985). "The necessity element of self-defense normally requires that the actor try to avoid the use of deadly force if he can safely and reasonably do so, for example by applying nondeadly force or by utilizing an obvious and safe avenue of retreat." *People v Riddle*, 467 Mich 116, 119; 649 NW2d 30 (2002).

In the present case, one witness testified that the victim was on the ground with his head covered with his arm when Garcia-Medina shot him. A letter from Garcia-Medina was read into evidence in which he states he took the victim's gun and then shot him. There was no evidence that the victim had a weapon or was a threat to anyone when he was shot in the head. Additionally, there was nothing preventing Garcia-Medina from leaving the victim's home once he had taken the victim's weapon. Therefore, a claim of imperfect self-defense would have been meritless, and counsel is not ineffective for failing to advance a meritless position. *People v Hawkins*, 245 Mich App 439, 457; 628 NW2d 105 (2001).

Garcia-Medina alluded to the fact that he did not testify in support of his assertion that counsel was ineffective for failing to advance a theory of imperfect self-defense. However, the record provides no evidence that Garcia-Medina wanted to testify and was not allowed or if he testified, that he would have provided evidence sufficient to support a claim of imperfect self-defense. Therefore, his assertion is without merit.

(Docket #1-3, Page ID##268-269.) The state court's decision is neither contrary to *Strickland v. Washington* nor an unreasonable application thereof. Counsel's failure to pursue a theory of imperfect self-defense was reasonable in the absence of any evidence suggesting that Petitioner shot Robinson in self-defense. None of the many witnesses who testified ever suggested that Robinson

was threatening Petitioner when Petitioner shot him in the head. Indeed, as the Michigan Court of Appeals found, the evidence established that Robinson was lying on his back bleeding from having been shot. (*See* Tr. V at 181.) Petitioner successfully wrestled Robinson's gun away from him. (*See* Tr. V at 64, 72, 181.) Once Petitioner had the gun, he shot Robinson in the head and killed him. (*See* Tr. V at 60-61, 72, 211; Tr. VII at 62.)

Additionally, as the Michigan Court of Appeals concluded, Petitioner had numerous opportunities to leave the scene without fear of being harmed. For example, in his letter to Delarosa, Petitioner wrote that when Valladolid kicked open the door, Valladolid immediately started firing his pistol in Robinson's direction. (*See* Tr. V at 72.) At that point, Petitioner could have removed himself from the scene without an imminent threat of harm. Instead, Petitioner went into the house, following Robinson to where he had fled. (*Id.*) Likewise, when Petitioner wrested the gun from Robinson, who lay bleeding on the floor, he could have fled the scene without fear of being harmed. Instead, Petitioner shot Robinson in the head. (*See id.* at 72, 211.)

On habeas review, this Court is bound by determinations of state law announced by a state appellate court on direct review. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). The state Court of Appeals held that an instruction on imperfect self defense would not have been supported by state law. In light of this binding determination, this Court cannot say that the failure to request a meritless instruction amounted to ineffective assistance of counsel.

2.     <u>Failing to Call a Listed Alibi Witness (Claim Four)</u>

Petitioner raises one additional issue with respect to his trial counsel's performance: whether counsel was ineffective for failing to call an alibi witness.[7] The Michigan Court of Appeals did not consider this claim, which was presented in Petitioner's pro per supplemental brief. However, the Kent County Circuit Court did consider this claim in connection with its ruling on Plaintiff's motion for relief from judgment. With respect to the alibi witness, the state court stated that

> Defendant has not indicated who the alibi witness is or what they would testify to. However, there are numerous witnesses that put the defendant at the scene of the crime. The testimony of the alibi witness would be incompatible with the self-defense theory that the defense counsel was asserting. . . . Thus, not calling the witness . . . did not deprive defendant of a substantial defense but likely strengthened the self-defense theory of defense counsel.

(Docket #1-2, Page ID##89-90.) As the state court noted, Petitioner does not identify the alibi witness he would have called, nor does Petitioner explain what this witness would have testified about. This failure alone is sufficient to reject Petitioner's claim.

Assuming Petitioner had identified an alibi witness who would have placed Petitioner in a location other than the crime scene, it would be a reasonable decision by defense counsel not to call this witness, given the testimony of the many witnesses who did testify and Petitioner's own admissions in the letter to Natalie Delarosa, wherein he admits to being present. (*See* Tr. V at 71-73.) At a minimum, counsel's credibility with the jury would have been entirely destroyed had she,

---

[7]In his direct appeal and in his motion for relief from judgment, Petitioner raised two additional issues regarding his counsel's effectiveness: whether counsel was ineffective for failing to argue intoxication as a defense; and whether counsel was ineffective for failing to contest the search and seizure of Petitioner's residence. Petitioner did not raise these two issues in the instant habeas petition.

under these circumstances, endeavored to create an alibi defense by presenting this unknown alibi witness. More importantly, counsel reasonably determined that the best defense strategy, the one most supported by the evidence, was a theory of self-defense; introduction of an alibi witness would have entirely undermined that strategy. *Strickland* demands that defense counsel's strategic choices be "[g]iven [a] high level of deference," *Davis v. Lafler*, 658 F.3d 525, 538 (6th Cir. 2011), and petitioner must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. Because the state court's finding that the strategy chosen by defense counsel was reasonable, Petitioner's claim fails under the first prong of *Strickland*.

### 3. Failing to Obtain Translation Assistance for Out-of-Court Communications with Petitioner (Claim Six)

Petitioner claims that his trial counsel was ineffective for failing to obtain translation assistance for out-of-court communications. Petitioner did not raise this claim at any point in his direct appeal. He did, however, attempt to raise it on collateral review. On February 15, 2007, Petitioner filed a motion for relief from judgment pursuant to MICH. CT. R. 6.502 which did not contain this claim. Sometime thereafter, Petitioner attempted to bring this claim before the Circuit Court in an amended motion for relief from judgment. The Circuit Court did not consider Petitioner's amended motion. *See* MICH. CT. R. 6.502(F) (leaving to the Court's discretion whether a petitioner will be allowed to amend a motion under this rule). Instead, the Court ruled on the merits of Petitioner's original motion. Absent certain, limited circumstances not present here, Petitioner was permitted to file "one and only one motion for relief from judgment . . . with regard to [his] conviction." MICH. CT. R. 6.502(G). Thus, at this juncture, Petitioner has no way to exhaust

this claim and no available remedy. "If the claims presented in the federal court were never actually presented in the state courts, but a state procedural rule now prohibits the state court from considering them, the claims are considered exhausted, but are procedurally barred." *Cone v. Bell*, 243 F.3d 961, 967 (6th Cir. 2001) (citing *Coleman*, 501 U.S. at 752-53), *rev'd on other grounds*, 535 U.S. 635 (2002).

When a state-law default bars further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the state court enforced the rule so as to bar the claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster v. Adams*, 324 F.3d 423, 436-37 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536. A habeas

petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

Petitioner has not attempted to explain his failure to raise this claim in his *pro per* supplemental brief on direct appeal or in his *pro per* application to the Michigan Supreme Court. Likewise, Petitioner does not explain his failure to include this claim in his original motion for relief from judgment in the Circuit Court or in his *pro per* applications to the Michigan appellate courts. Where a petitioner fails to show cause, the court need not consider whether he has established prejudice. *See Engle*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985). Moreover, Petitioner does not attempt to demonstrate that he is actually innocent of the offense. Accordingly, because Petitioner's claim is procedurally barred, habeas relief on this claim is not warranted.

### B.     Appellate Counsel

1.     Failing to Visit or Consult with Petitioner or Obtain Translation Assistance (Claims Two and Seven)

Petitioner contends that his appellate counsel was ineffective because counsel did not visit or consult with Petitioner and did not obtain translation assistance for him. With respect to this issue, the state circuit court said:

> Defendant . . . argues that appellate counsel was ineffective because he did not visit or consult the defendant and did not obtain translation assistance for the defendant. The standard for ineffective assistance of counsel is the same for appellate attorneys as it is for trial attorneys. *People v Reed*, 198 Mich App 639, 646; 499 NW2d 441 (1993). Defendant has failed to prove that defense counsel never consulted with him or failed to provide translation assistance. MCR 6.502(E) allows a defendant to attach to the motion any affidavit, document, evidence, or memorandum of law to

support the relief requested. Defendant failed to attach any sort of documentation. As for the translation assistance, it is unclear from defendant's motion when during the appeal process the defendant needed translation assistance.

Furthermore, defendant has not shown that there was any actual prejudice as a result of counsel not visiting him or providing translation assistance. The grounds for relief as a result of actual prejudice from alleged irregularities is set forth in Michigan Court Rules; "[b]ut for the alleged error, the defendant would have had [a] reasonably likely chance of acquittal. MCR 6.508(D)(3)(b)(I). Review of "Defendant-Appellant's Brief on Appeal" shows that appellate counsel carefully reviewed the trial transcripts and set forth a well-written argument in favor of Defendant. Defendant has failed to show actual prejudice caused by the appellate counsel.

(Docket #1-2, Page ID#91.) The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application thereof. As the state court noted, Petitioner failed to substantiate his claims that his appellate counsel did not visit or consult with him, or provide translation assistance. Moreover, even assuming arguendo that appellate counsel did not communicate with Petitioner, Petitioner fails to identify how that might have prejudiced him.

An appellant has no constitutional right to have every non-frivolous issue raised on appeal. "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Id.* (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. As the Supreme Court recently has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2000). In such cases, the petitioner

must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.* Petitioner fails to identify any issues that he believes should have been presented to the appellate court, but were not.

Appellate counsel filed an appeal (docket #26) raising one issue. That Petitioner filed a *pro per* supplemental brief on appeal, suggests that, even if minimally, appellate counsel informed Petitioner about the claim he intended to assert and informed Petitioner that he would not bring the claims Petitioner ultimately presented in his *pro per* supplemental brief because he believed they lacked merit. (*Id.*) It is not ineffective assistance for appellate counsel to decide not to raise meritless claims. *See Smith v. Murray*, 477 U.S. at 536.

Moreover, Petitioner's claim that he was not provided translation assistance contradicts his claim that appellate counsel did not communicate with him. It is self-evident that if Petitioner needed appellate counsel to provide translation assistance, the need arose because appellate counsel was communicating, whether by letter or phone, with Petitioner in English. Further, Petitioner's claim that he required translation assistance to understand English is belied by the fact that Petitioner, himself, communicated quite proficiently in English. Petitioner's letter to Natalie Delarosa was written in English save for a few sentences that were written in Spanish. (*See* Tr. V at 71-74.) Additionally, in the colloquy conducted immediately prior to the start of trial between Petitioner and the trial court regarding the need for an interpreter, Petitioner acknowledged that the assistance of an interpreter would be helpful and agreed that he would ask the interpreter questions when he did not understand something. (*See* Tr. II at 5-7.) Even when the court directly asked whether Petitioner needed to have "everything" interpreted for him, Petitioner made clear that he did not and that there was only a "possibility" that he might need "most of it" translated. (*Id.*)

Even if appellate counsel's alleged deficiencies caused his performance to fall below an objective standard of reasonableness, Petitioner fails to establish that he was prejudiced. Petitioner does not provide any facts to demonstrate that he was prejudiced by appellate counsel's conduct or how the outcome of this case would have been different but for appellate counsel's deficiencies. *See Strickland*, 466 U.S. at 694. Because Petitioner has not established either that appellate counsel was deficient or that he was prejudiced by appellate counsel's alleged deficiencies, the state court properly denied Petitioner's claim. Thus, habeas relief on this claim is not warranted.

## II.    Newly Discovered Evidence

Petitioner raises two separate, but complementary, issues with respect to newly discovered evidence: (1) that appellate counsel was ineffective for failing to move for a new trial based on the newly discovered evidence (Claim Three) and (2) that the newly discovered evidence requires that he be given a new trial (Claim Five). The state court addressed the newly discovered evidence, stating

> [D]efendant asserts that he is entitled to a new trial because one of the prosecution's witnesses recanted their statement. Defendant offers no evidence to show who the witness is or what part of their testimony has been recanted. Evidence of recanted testimony is highly speculative. *People v Canter*, 197 Mich App 550, 559-60; 496 NW2d 336 (1992). Even if defendant presented recanted testimony, there was overwhelming evidence from several other witnesses that he was guilty of the crimes charged. He was seen entering into the victim's house, shooting the victim with the victim's gun, and a letter written by the defendant was entered into evidence describing how he shot the victim in the head. (TT 5/18/04 pp/ 70-73; 131-133; 181-185). A new trial is not appropriate because even if there were deficiencies as alleged by the defendant, the great weight of evidence would still result in defendant's conviction of the crimes alleged.

(Docket #1-2, Page ID#91-92.) Petitioner does not appear to have submitted Escobar's affidavit to the state court in connection with his motion for relief from judgment. Nevertheless, even if the state

court knew that Escobar was the witness who recanted and in his recantation he claimed that his entire testimony was a lie, it is not reasonable to think that this information would have changed the court's decision. Escobar was one of many witnesses who testified to substantially the same facts: Petitioner was in the house and shot Robinson with his own gun while Robinson lay on the floor bleeding. (*See* Tr. V at 60-61, 64, 72, 118.) Even if Escobar testified that he was not actually in the house and did not see what happened, this testimony would have had no bearing on the outcome of Petitioner's case. It is reasonably probable that the jury would have dismissed Escobar as a liar and disregarded his testimony. Given that all of the other percipient witnesses testified consistently, the outcome of Petitioner's trial would have been the same. Accordingly, Petitioner was not entitled to a new trial based on newly discovered evidence.

Additionally, Petitioner claims that appellate counsel was ineffective for failing to seek a new trial based on the recanted testimony. Because the state courts did not address the merits of this claim, the Court conducts *de novo* review. *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

Although the state court did not directly address Petitioner's claim that appellate counsel was ineffective for failing to seek a new trial based on recanted testimony, the Court specifically found that the facts did not support a new trial. As a result, even if one of the many prosecution witnesses had recanted, counsel cannot have been ineffective for failing to move for a new trial. Counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel. *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007); *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *see also Willis v. Smith*, 351 F.3d 741, 745 (6th Cir. 2003) (quoting *Greer v. Mitchell*, 264

F.3d 663, 676 (6th Cir. 2001) ("'appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit.'" ).

## Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be denied on its merits.


Dated:   January 17, 2014                    /s/  Joseph G. Scoville
                                             United States Magistrate Judge


## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).